# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CRAFT SMITH, LLC, a California limited liability company, <br><br> Plaintiff, <br> v. <br><br> EC DESIGN, LLC, a California limited liability company, <br><br> Defendant. <br> ———————————————— <br> EC DESIGN, LLC, a California limited liability company, <br><br> Counterclaimant, <br> v. <br><br> CRAFT SMITH, LLC, a California limited liability company, and MICHAELS STORES, INC., a Delaware corporation, <br><br> Counterclaim Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br><br> Case No. 2:16-cv-01235 <br><br> U.S. District Judge Dee Benson |

On April 5, 2019 the court heard oral argument on EC Design's Motion for Partial Summary Judgment on First Claim for Copyright Infringement, Craft Smith and Michaels' Motion for Summary Judgment, as well as Craft Smith and Michaels' Motion to Exclude Richard S. Hoffman and EC Design's Motion to Exclude Expert Opinion of Clarke Nelson. (Dkt. Nos. 96, 99, 107, 110.)  At the conclusion of the hearing, the court took the matter under advisement with a written order to follow.

**<u>BACKGROUND</u>**

EC Design claims that when Craft Smith and its distributor Michaels Stores began selling the Recollections Planner in October 2016, they infringed on 1) EC's LifePlanner trade dress under 15 U.S.C. § 1125(a) and 2) EC's copyright in the LifePlanner under 17 U.S.C. § 101 *et seq.*  (*See* Dkt. No. 54 at 6; Dkt. No. 112 at 6-8, 19.)  EC also brings several state law unfair competition claims against Craft Smith and Michaels.  (Dkt. No. 54 at 41-47.)

Erin Condren is the founder of EC Design, a California designer and retailer of personal planners, organizers, notebooks, stationery, school and holiday goods, which it sells on its website www.erincondren.com, Amazon, and other retail locations.  (Dkt. No. 54 at 7.)  Craft Smith, one of EC's competitors, is a California company that began operating in January 2014; it makes and sells products in the personal organizer and crafts markets, including planners under the "Recollections" brand.  (Dkt. No. 2 at 2; Dkt. No. 112 at 12.)  Michaels is a Delaware corporation that sells craft, art, scrapbook, and stationery products at its numerous retail stores, as well as its website www.michaels.com.  (Dkt. No. 2 at 7-8.)  Craft Smith and Michaels have worked together to develop and sell planners since 2014; Michaels is by far Craft Smith's largest customer.  (Dkt. No. 112 at 12.)

In 2007, Erin Condren created EC's flagship product, the LifePlanner.  (Dkt. No. 112 at 8.)  The LifePlanner has evolved significantly over time since 2007.  According to EC, "[e]ach year since 2007, EC's product development team [has created] a new version of the LifePlanner that builds on Ms. Condren's original design."  (*Id.*)  From 2007 to 2015 EC only offered LifePlanners with a vertical layout, but since its 2015-16 LifePlanner version it has offered both horizontal and vertical layouts.  (*Id.*)  The vertical layout uses different artwork and graphics than does the horizontal layout.  (Dkt. No. 138 at 7.)

As of October 2016, the LifePlanner products purchased through the erincondren.com website were customizable.  Purchasers could select (i) cover artwork; (ii) removable or "luxe" cover style; (iii) a custom message or photograph for the cover; (iv) layout style; (v) coil color; (vi) colorful or neutral color scheme; and (vii) gold foil accents.  (Dkt. No. 98 at 10-12.)

Since 2009, EC claims to have sold 1,549,770 LifePlanner products, with revenue from these sales totaling approximately $65 million.  (Dkt. No. 54 at 23.)  In 2016 alone, EC received $18.5 million in U.S. sales of the LifePlanner.  (*Id.*)

On January 15, 2015, EC reached out to Craft Smith to discuss a "possible . . . private label creation between [the] two companies."  (Dkt. No. 112 at 10.)  Craft Smith's owner and designer were both enthusiastic about the potential to work with EC; Craft Smith's internal correspondence reveals a high level of interest in and admiration for EC's brand, planner quality, and popularity in the market.  (*See* Dkt. No. 112 at 10, 15.)  Craft Smith proposed working with EC to develop a planner together to sell in Michaels stores; ultimately, however, they were unable to arrive at an agreement.  (*Id.* at 11.)

Six months after discussions ended with EC, Craft Smith began preparing to propose a new spiral-bound planner to Michaels that would be similar to EC's LifePlanner.  (Dkt. No. 112 at 12.)  This would be the first spiral planner Craft Smith had produced.  (*Id.*)  In February 2016, Craft Smith sent its manufacturer in China an EC LifePlanner sample to get a baseline for what its pricing would be on the proposed product for Michaels.  (*Id.* at 13.)  Craft Smith told the manufacturer, "We want the book with the same size and quality of spiral and same laminated type cover. I want to get a quote for this. Same pagination and sheet counts and everything the same."  (*Id.*)

On February 29, 2016, Michaels and Craft Smith met to discuss developing a new 2017 planner series to launch in the fourth quarter of 2016.  (*Id.*)  According to meeting notes, Michaels' and Craft Smith's "[c]oncept [was] to manufacture a like item to the current Erin Condren Life Planner."  (Dkt. No. 112 at 14.)  The projected cost for the new spiral planner was "based on everything you see in the EC planner," with a projection that the new planner could be offered at a discounted price of $24.99-$29.99 in comparison with the LifePlanner's retail price of $40.  (*Id.*)

On March 24, 2016, Craft Smith completed its horizontal and vertical Recollections Planner calendar arrangements in black and white, as well as the "initial cover . . . themed . . . [and] calendar artwork."  (*Id.*)  By April 5, 2016, the final artwork and arrangement of the new planner series was approved by Michaels to move forward.  (*Id.* at 16.)  The planner files were sent to the manufacturer in China on April 5th, along with instructions to "match [the new planner] exactly to sample" referring to the LifePlanner Craft Smith had previously provided.  (*Id.*)[1]  The sticker pages were purposefully sized to match the LifePlanner's weekly layouts.  (*Id.* at 17.)  Craft Smith emphasized that the new Recollections Planner needed to "feel like overall weight of current sample."  (*Id.*)  On April 6, Craft Smith further instructed the manufacturer to "match [the spiral size] of the sample."  (*Id.*)

In early April 2016, Michaels asked Craft Smith to compare the new Recollections Planner with the LifePlanner, including a request to make sure that no quotes were copied from the LifePlanner "to make sure our planners are not too similar to hers."  (*Id.* at 18.)  Craft Smith provided the "specs" of both planners, revealing that both planners are sized at 7.25" x 9.25",

---

[1]  This included instructions to match the sticker page paper quality "to current sample;" to use "double sided coated paper (same as sample)" and to "match to same thickness as sample" for the pocket page; to include a "[p]lastic pocket in back (like current sample);" and to match the "thickness of the paper or laminating plastic" of the cover "exactly to sample."  (Dkt. No. 112 at 16-17.)

and that the twelve-month versions both have a total of 178 pages, and both have removable covers.  (*Id.*)  EC alleges that the design and arrangement of Recollections didn't change after that comparison was finished.  (*Id.*)  On April 26, Craft Smith submitted its first purchase orders to the manufacturer.  (*Id.* at 17.)  One day later while reviewing the planner's packaging images, a Craft Smith employee "noticed that there are still a few things on them that need to be photoshopped, like some of [EC's] prints are showing in spots b/c we used her books for part of our mock-ups. So that definitely needs to be fixed to avoid any major problems."  (*Id.*)

In May 2016, Michaels approached EC to discuss the possibility of Michaels carrying EC's planners at its stores.  (*Id.* at 11.)  Prior to that meeting, Craft Smith had shared consumer survey results showing that "Erin Condren was the most popular" planner brand.  (*Id.*)  However, this relationship also never materialized as the parties failed to agree on a licensing fee or royalty rate.  (*Id.*)

Michaels released Craft Smith's Recollections Planner in October 2016, which was viewed as "a hit" with customers.  (*Id.* at 19.)

On November 29, 2016, Craft Smith received a letter from EC Design's counsel which included an express allegation that Craft Smith had infringed on EC's alleged copyrights and trade dress rights in the LifePlanner.  (Dkt. No. 2 at 3.)  EC demanded that Craft Smith immediately cease selling or advertising any planners, including the Recollections Planner, that incorporate any design, text, graphic, color combination, or other material allegedly found in the LifePlanner, and to notify all distributors to return unsold planners to Craft Smith.  (*Id.*)

On December 8, 2016, Craft Smith filed a complaint in this court against EC seeking a declaratory judgment of no copyright infringement and no trade dress infringement, as well as an award of Craft Smith's costs and attorney fees.  (*Id.*)

On the same day Craft Smith initiated this action (December 8, 2016), EC applied for the following copyright registrations from the U.S. Copyright Office for its 2016-17 LifePlanners, which were granted on December 12, 2016:

- LifePlanner Horizontal Layout 2016/2017, U.S. Registration No. VA 2-024-598.

- LifePlanner Vertical Layout 2016/2017, U.S. Registration No. VA 2-024-599.

(Dkt. Nos. 110-12, 110-13, 110-15, and 110-16.)

Approximately eight months later, on August 11, 2017, EC applied for a compilation copyright in "2-D artwork, layout and graphics" as well as "Selection, coordination, and arrangement of text and 2D artwork." (*See* Dkt. No. 110-17.)  Before the copyright was granted by the U.S. Copyright Office, the Copyright Office specifically refused registration of EC's LifePlanner "layout" claim, and provided the following rationale:

> … "layout" does not describe a copyrightable type of authorship. Please note that the general layout or format of a book, a page, a slide presentation, a website, or the like, is not copyrightable because it is a template of expression. Compendium of U.S. Copyright Office Practices, Third Edition § 313.3(E). As such, please authorize me to remove the term "layout" from the applications.

(Copyright Office Correspondence, Dkt. No. 138-2 at 5.)

The Copyright Office accordingly registered the following modified version of EC's copyright claim in "2-D artwork, compilation of introductory and section phrases, graphics" on August 17, 2017:  2016/2017 Vertical LifePlanner Compilation, U.S. Registration No. VA 2-072-725.  (Dkt. No. 110-18.)

EC's alleged LifePlanner trade dress is unregistered.  (Dkt. No. 98 at 10.)

On January 18, 2018, EC filed its second amended counterclaim against Craft Smith of copyright infringement, trade dress infringement under the Lanham Act, and other unfair

competition and misappropriation claims, seeking injunctive relief, damages, costs, and attorneys' fees.  (Dkt. No. 54.)

<u>**DISCUSSION**</u>

A party moving for summary judgment meets its burden by demonstrating "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."  *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).  An issue of fact is material "if under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

The moving party may satisfy its initial burden of making a prima facie demonstration that no genuine issue of material fact exists by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.  *See Adler*, 144 F.3d at 670-71. "If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts . . . from which a rational trier of fact could find for the nonmovant."  *Id.* at 671.

## I.      Copyright Infringement Claim

The Constitution's Copyright Clause gives Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors . . . the exclusive Right to . . . their . . . Writings."  Art. I, § 8, cl. 8.  The plain meaning of Article I, § 8, cl. 8 of the Constitution demands original authorship for a work to merit copyright protection.  Pursuant to this constitutional authority, the Copyright Act of 1976 ("Copyright Act") was enacted to

provide copyright owners with "exclusive rights" to distribute, reproduce, or prepare derivative works of their "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. §§ 102(a), 106. Originality is thus both constitutionally and statutorily required, and has been described as the "*sina qua non*" and "touchstone of copyright protection." *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 302 (7th Cir. 2011). The traditional dichotomy employed by courts in copyright cases to differentiate between facts or ideas and expression of those facts or ideas "derives from the concept of originality which is the premise of copyright law." *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1368 (5th Cir. 1981).

Not all copying amounts to copyright infringement. *See Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 408 (5th Cir. 2004). To prevail on a copyright infringement claim under the Copyright Act, a party (here EC Design) bears the burden of proving (1) that it owns a valid copyright, and (2) that the defendant copied protectable constituent elements of the copyrighted work. *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1370 (10th Cir. 1997); *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 548 (1985).

### a. Ownership of a Valid Copyright

To ultimately succeed in its copyright claim, EC Design must first show that it owns a valid copyright in its 2015-16 LifePlanners. In modern copyright cases, this is often established by a certificate of registration which "constitute[s] prima facie evidence of the validity of the [asserted] copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). The presumption of validity does not apply, however, to alleged authorship that is not "explicitly claimed in the application" that was deposited with the Copyright Office, as the office "does not examine any authorship that is not claimed in the application." *U.S. Copyright Office, Compendium of U.S. Copyright Office Practices* § 503.3 (3d ed. 2017). This prima facie

presumption therefore does not extend "to unclaimed authorship that appears in the [registered] work." *Id.* Importantly, Section 410(c) of the Copyright Act also provides that "[t]he evidentiary weight to be accorded the certificate of a registration . . . shall be within the discretion of the court." 17 U.S.C. § 410(c).

EC Design claims that it owns a valid compilation copyright in EC's "creative selection and arrangement of the many elements, materials, and data comprising the [2015-2016] LifePlanner" (hereafter "EC's asserted compilation"). (Dkt. No. 151 at 7, 12.) EC further argues that because its registered 2016-17 LifePlanner is a derivative of EC's underlying 2015-16 work, EC Design is entitled to a presumption of validity for its underlying compilation. Craft Smith responds that because EC Design never claimed copyright in a compilation of planner parts (divorced of specific artwork, graphics, or text) in its 2016-17 LifePlanner registrations that were deposited with the Copyright Office, EC "enjoys no presumption of . . . validity with respect to the asserted 2015-2016 LifePlanners or the asserted compilation of planner parts." (Dkt. No. 138 at 5, 12-13.)

The court agrees with Craft Smith on the initial question of the presumption of validity. Because the copyright asserted by EC Design in this case is a compilation copyright, the court looks first to the language of EC's registration certificate for the "2016/2017 Vertical LifePlanner Compilation" that was deposited in the Copyright Office. (Dkt. No. 110-19.) That registration certificate describes the "limitation of copyright claim" as only including the following new material: "2-D artwork, compilation of introductory and section phrases, graphics." (*Id.*) In fact, the certificate explicitly excludes "Calendar arrangement and calendar text" from the copyright claim. (*Id.*) And as Craft Smith points out, EC initially attempted to claim "layout" as part of its claim for copyright protection, but this was denied by the Copyright

Office because "layout does not describe a copyrightable type of authorship." (Dkt. No. 138 at 41.) Thus, because EC's asserted compilation seeks much broader protection than the scope outlined on the 2016-17 LifePlanner registration certificate, the court finds that EC's 2015-16 LifePlanners are not entitled to a presumption of validity with respect to EC's asserted compilation copyright.

However, EC points out that even absent a presumption of validity, because "a copyright [automatically] exists the moment an original idea leaves the mind and finds expression in a tangible medium, be it words on a page, images on a screen, or paint on a canvass," *See La Resolana Architects, PA v. Clay Realtors Angel Fire*, 416 F.3d 1195, 1198 (10th Cir. 2005), *overruled on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010), EC is nevertheless entitled to seek protection for its asserted compilation. Assuming, without deciding, that EC has such a right, EC can only be successful in its infringement claim if it has sufficient evidence to show that the asserted compilation qualifies as EC's original authorship and protectable expression. For the reasons outlined below, the court holds that EC's asserted compilation does not qualify as a work of original authorship and protectable expression, and is therefore not entitled to copyright protection.

**b. Protectable Expression**

"The controlling principle in this case is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017). Courts therefore begin and end their "inquiry with the text [of the Copyright Act], giving each word its ordinary, contemporary, common meaning." *Id.*

Section 102(a) of the Copyright Act identifies eight categories of works of authorship that are protectable: (1) literary works; (2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisual works; (7) sound recordings; and (8) architectural works. Section 102(b) adds that copyright protection never extends to "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). "[F]acts, like ideas, are not copyrightable." 145 Am. Jur. Proof of Facts 3d 1 (2015).

"Blank forms, such as time cards, graph paper, account books, diaries, bank checks, scorecards, address books, report forms, order forms and the like, which are designed for recording information and do not in themselves convey information" are not protectable works of authorship under Section 102(a). *See* 37 C.F.R. § 202.1(c). Similarly, "common property containing no original authorship" including "standard calendars" are not subject to copyright. 37 C.F.R. § 202.1(d).

### i. Compilation Copyrights

Section 103 states that "[t]he subject matter of copyright as specified by section 102 includes compilations . . ." 17 U.S.C. § 103. A "compilation" is defined as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." *Id.* § 101. Works that meet the statutory definition of a "compilation" may be copyrightable under Section 103 "even if the individual elements making up the compilation are not copyrightable in themselves" under Section 102(a). *Dataworks, LLC v. Commlog, LLC*, No. 09-CV-00528-WJM-BNB, 2011 WL 2714087, at *5 (D. Colo. July 13, 2011).[2] This

---

[2] The court in *Dataworks* held that "the required levels of originality and creativity ha[d] been met . . . as to the compilation of the Custom Logs. The selection, design, and placement of the calendars, daily logs, repair and

interpretation was further articulated by the Tenth Circuit in *Enterprise Mgmt. Ltd. v. Warrick*, 717 F.3d 1112 (10th Cir. 2013). The court in *Enterprise Management* held that even if the relevant expression is composed exclusively of non-protectible elements, as long as (1) there are multiple ways to select and arrange those elements and (2) it was selected and arranged in an original and creative manner, that expression may still be eligible for protection as a compilation. The court ultimately found "protectable creative insight in [the plaintiff's] arrangement and choice of expression" of a diagram composed essentially of unprotectable elements. *Id.* at 1119.

## ii. Requirements of Section 102

For a compilation to ultimately be protectable, it must qualify as "original authorship" as a whole under one of the eight enumerated categories listed under Section 102. "It is essential to recognize . . . that Section 103 complements Section 102. Thus, while a compilation may be eligible for copyright protection, it must nevertheless satisfy the requirements of Section 102. A compilation must, in other words, represent an original work of authorship, and in no case may copyright protection extend to any idea, procedure, process, or system." *Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*, 803 F.3d 1032, 1041 (9th Cir. 2015).

This is consistent with the Copyright Office's interpretation of Section 103 in its 2012 Statement of Policy, requiring compilations as a whole to qualify under one of Section 102(a)'s enumerated categories of protected works. *See Registration of Claims to Copyright*, 77 Fed. Reg. 37,605, 37,605 (June 22, 2012); *see also* U.S. Copyright Office, *Compendium of U.S.*

---

maintenance logs, collective repairs lists, in-store manager's meeting logs, injury logs, and BEP policies and procedures within the Custom Logs are sufficiently original and creative to warrant copyright protection as compilations." 2011 WL 2714087 at *5; *see also Health Grades, Inc. v. Robert Wood Johnson Univ. Hosp., Inc.*, 634 F.Supp.2d 1226, 1233 (D.Colo. 2009) (observing that "a compilation is deemed original and hence protected by copyright if the author has independently and with at least a minimal degree of creativity made choices as to which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers"); *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 204 (9th Cir. 1989) (finding that "a copyrightable compilation can consist mainly or entirely of uncopyrightable elements").

*Copyright Office Practices* § 503.1(C) (3d ed. 2017) ("[A] compilation or derivative work may be copyrightable provided that it qualifies as a literary work, a musical work, a dramatic work, or one of the other congressionally-established categories of authorship.").  Craft Smith acknowledges that the Copyright Office's 2012 Statement of Policy "does not carry the force of law," but argues that the Copyright Office's interpretations of the Copyright Act are nevertheless entitled to *Skidmore* deference.  (*See* Dkt. No. 138 at 36-39.)  Besides the interpretation's consistency with *Bikram's Yoga* and Section 103's plain and ordinary meaning, the court is also persuaded by Craft Smith's demonstration of "the thoroughness evident in [the Copyright Office's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . ."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  The court thus finds that the Copyright Office's particular interpretation of Section 103 to be persuasive and deserving of deference.

EC Design argues that its LifePlanner compilation qualifies as a protected work of authorship under Section 102(a) because it incorporates both "literary and graphic elements into the compilation" as a whole, and consists of "text, phrases, data, and numerical elements", qualifying as either 1) a "literary work" or 2) a pictorial or graphic work.  (*See* Dkt. No. 151 at 8-9.)  Craft Smith responds that because literary works are defined as "works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia…." (17 U.S.C. § 101), and the LifePlanner "does not express anything in words, other than the short phrases which are not copyrightable," it cannot meet the definition of a literary work.  (Dkt. No. 138 at 33-34.)  Craft Smith further argues that because the LifePlanner has an "intrinsic utilitarian function that is not merely to portray the appearance of the article or to

convey information," it is a "useful article" (15 U.S.C. §101) that cannot be protected as a pictorial or graphic work.  (*See* Dkt. No. 138 at 38.)

The court finds no protectable expression in EC's asserted compilation.  Once the non-copied features are removed from consideration (i.e., the 2-D artwork, introductory and section phrases, and graphics), EC's remaining compilation ultimately consists of a collection of planner parts, common property (primarily calendars), templates of expression, and blank forms (such as lined pages and graph paper).  For EC to assert that such a compilation qualifies as "authorship" under any definition strains credulity, let alone the specific requirements of Section 102.  EC's idea to arrange planner parts, templates, common property, and blank forms in a certain order is just that—an idea.  While the LifePlanner could feasibly be conceptualized as a creative process for organizing one's life, processes are also outside the scope of Section 102 and thus unprotectable.  *See Bikram's Yoga*, 803 F.3d 1032.  Nor is the layout of EC's calendars copyrightable.  When the Copyright Office considered EC's application for a LifePlanner "layout" claim, it refused registration of that claim, and provided the following justification:

> … "layout" does not describe a copyrightable type of authorship. Please note that the general layout or format of a book, a page, a slide presentation, a website, or the like, is not copyrightable because it is a template of expression. Compendium of U.S. Copyright Office Practices, Third Edition § 313.3(E). As such, please authorize me to remove the term "layout" from the applications.

(Copyright Office Correspondence, Dkt. No. 138-2 at 5.)

The relevant components of the LifePlanner (i.e., those features comprising EC's asserted compilation, which excludes the 2-D artwork, phrases, and graphics which are not part of EC's infringement claim) do not as a whole qualify as a "literary work" under the plain meaning of Section 102(a).  Merely printing or publishing a work into a book form does not create a literary work—the statute requires that a book, greeting card, etc. must also "express" authorship "in

words, numbers, or other verbal or numerical symbols or indicia . . ." to qualify as a literary

work.  17 U.S.C. § 101.  Excluding the LifePlanner's introductory and section phrases

(uncontested by EC in this case), very few words are even used throughout the planner.  It is

axiomatic that for a party to claim a compilation of words or data, it must have at least used a

sufficient quantity of words or data in the first place for the work to qualify as a work of

authorship under Section 102.  EC Design has not even met this initial burden.[3]  If the text of the

LifePlanner's introductory and section phrases were all part of EC's asserted claim against Craft

Smith, EC would have likely satisfied this initial literary work threshold, but EC is not alleging

that the actual text of these short phrases are the subject of its infringement claim.  Nor is the

court persuaded that any "numbers or other verbal or numerical symbols or indicia" present in

the LifePlanner qualify as a literary compilation.[4]

Additionally, the Copyright Act defines pictorial, graphic, and sculptural (PGS) works as

"two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs,

prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings,

including architectural plans."  17 U.S.C. § 101.  However, the Supreme Court has identified an

important carve out for useful articles under what has become known as the "separability"

doctrine:

> The Copyright Act also establishes a special rule for copyrighting a [PGS] work
> incorporated into a "useful article," which is defined as "an article having an intrinsic
> utilitarian function that is not merely to portray the appearance of the article or to convey

---

[3]  For instance, the court declines to find EC's selection and arrangement of calendar words like July, August, etc., or the names of holidays like Labor Day, to be a literary compilation under Sections 102 and 103 of the Act.  Nor is EC's addition of heading words like "notes," "goals," or "thankful thought," or writing the words "birthday", "concert" or "vacation" on colorful stickers sufficient to qualify as a work of authorship.  Holding otherwise would create a Section 102 workaround where unprotectable blank forms and common property (like calendars) can be transformed into a protectable literary compilation by merely adding a few scattered words to the forms.

[4]  Rather, the numbers present in the 2015-16 LifePlanners appear to be exclusively for designating calendar years and days—hardly the same as analytical data or other numerical compilations that can qualify as protectable authorship.

> information." The statute does not protect useful articles as such. Rather, "the design of a useful article" is "considered a [PGS] work only if . . . such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."

*Star Athletica*, 137 S. Ct. at 1008 (quoting 17 U.S.C. § 101).

Separating out the LifePlanner's 2-D artwork and graphics (not part of EC's infringement claim), for EC's remaining asserted compilation to qualify as a PGS work, it would need to be a three-dimensional work of art under the statute's plain meaning. The court finds that EC's asserted compilation does not qualify as a three-dimensional work of art, either collectively or individually, but instead more naturally as a book. Furthermore, the LifePlanner clearly has an "intrinsic utilitarian function" of organizing and planning one's daily life. And as Craft Smith persuasively argues, a "compilation of planner parts cannot . . . be perceived as a three-dimensional work of art separate from the LifePlanner itself . . . [because it] cannot possibly exist separately from the LifePlanner." (Dkt. No. 138 at 38-39.) Thus, even if the LifePlanner were a PGS work, EC's asserted compilation of planner parts and layout is not separable from the LifePlanner itself, and thus does not qualify for protection under Section 102.[5]

The court therefore holds that the applicable selection and arrangement of EC Design's asserted compilation do not satisfy the requirements of Section 102, and are thus not protectable expression.

### c. Copying Protectable Constituent Elements

---

[5] EC cites *Harper House* for the proposition that personal organizers cannot be useful articles. *See* 889 F.2d at 203. In that case, the U.S. Court of Appeals for the Ninth Circuit found that such organizers cannot qualify as PGS works, making the useful article rule inapplicable. The court agrees with the Ninth Circuit that personal organizers are not PGS works, but in any case decides to not rely on its entire rationale because the compilation at issue in that case was notably distinct from EC's asserted LifePlanner compilation here (i.e., divorced of 2-D artwork, introductory and section phrases, and graphics).

Even if the LifePlanner's selection and arrangement qualified as a compilation, and even if EC Design's selection and arrangement were found to exhibit more than the minimum "modicum of creativity" required under Section 103, EC would still fail to prove infringement under the applicable supersubstantial similarity test.

### i. Originality

Even supposing that EC Design's asserted compilation were protectable, the court would also need to determine whether it had "selected, coordinated and arranged the elements of [its LifePlanner] in an original way" to determine whether the compilation met the originality requirement. *Enterprise Mgmt.*, 717 F.3d at 1119. Section 103 makes clear that if a work qualifies as a copyrightable compilation, "copyright protects only the author's original contributions—not the facts or information conveyed." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 359 (1991). This rule ensures that compilation copyrights are not used as "a tool . . . to keep others from using the [preexisting] facts or data he or she has collected." *Id.* Rather, the preexisting material assembled in the compilation "may be freely copied because copyright protects only the elements that owe their origin to the compiler—the selection, coordination and arrangement of facts." *Id.*

However, the originality requirement for compilation works is quite easy to satisfy, as the "requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* at 345; *see also id.* ("The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be."). While the Supreme Court has determined that a valid compilation copyright cannot be sustained for "a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent," nevertheless "the vast majority of compilations will pass this [minimal creativity] test." *Id.* at

359.[6]  In fact, a compilation does not even need to be "novel" to be original.  *Id.* at 358.  Thus,

perhaps under this standard EC Design could demonstrate that its asserted compilation exhibits

the minimal "modicum of creativity" and independence required to establish sufficient

originality.[7]

However, originality is insufficient without the requisite level of copying.  EC Design

would also have to demonstrate that a sufficient degree of copying of the work's protectable

expression (here the applicable LifePlanner selection and arrangement) took place.

## ii.  "Supersubstantial Similarity" Test

In *Blehm*, the Tenth Circuit emphasized that courts "must be careful not to grant [parties]

a monopoly" over ideas like "all figures featuring black lines representing the human form."

*Blehm v. Jacobs*, 702 F.3d 1193, 1208 (10th Cir. 2012).  This concern is especially high for

compilation copyrights composed of unprotectable elements like the applicable LifePlanner

compilation, where the court should "not be so generous as to sweep in all manner of [day

planners] as potentially infringing" on EC Design's compilation.  *See id.*

The test of infringement for such compilations, or what the Supreme Court has referred to

as "thin" copyrights, *see Feist Publications*, 499 U.S. at 349, is thus appropriately much more

stringent than a typical copyright case where direct evidence of copying can be sufficient by

itself to establish a copyright violation.  *See Enterprise Mgmt.*, 717 F.3d at 1117.  Specifically,

the Tenth Circuit has determined that

> [a]lthough a compilation gains copyright protection with only minimal creativity in the
> selection and arrangement of facts, *Feist*'s statement that the copyright is "thin" has

---

[6]  The Court in *Feist* ultimately held that even though plaintiff's selection, coordination, and arrangement of white pages (containing a selection of names, towns, and telephone numbers) required effort to produce, it lacked "the modicum of creativity necessary to transform mere selection into [original] copyrightable expression."  *Id.* at 362-363.

[7]  As EC persuasively notes, its asserted compilation is certainly more creative than a white pages telephone directory (*see Feist Publications*, 499 U.S. 340), or a collection of tools or rocks.

implications when the holder sues an alleged infringer. It would seem to follow analytically that more similarity is required when less protectable matter is at issue. Thus, if substantial similarity is the normal measure required to demonstrate infringement, 'supersubstantial' similarity must pertain when dealing with 'thin' works.

*TransWestern Pub. Co. LP v. Multimedia Mktg. Assocs., Inc.*, 133 F.3d 773, 776 (10th Cir. 1998); *see also Harper House*, 889 F.2d at 205 ("[C]ompilations that consist largely of uncopyrightable elements receive only limited protection. As with factual compilations, copyright infringement of compilations consisting largely of uncopyrightable elements should not be found in the absence of bodily appropriation of expression," which means "copying or unauthorized use of substantially the entire item."); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright,* § 13.03[A] at 13-28 (1997). "When the range of protectible and unauthorized expression is narrow, the appropriate standard for illicit copying is *virtual identity.*" *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1439 (9th Cir.1994) (emphasis added); *see also* Jane C. Ginsburg, *No "Sweat"? Copyright and Other Protection of Works of Information After Feist v. Rural Telephone*, 92 Colum. L.Rev. 338, 349 (1992) ("'Even if the compilation is deemed original, what kind of copying will be held to infringe it?' The answer [after *Feist*] appears to be: 'Virtually none, short of extensive verbatim copying.'").

As with the substantial similarity test, the court finds that the supersubstantial similarity test is "a mixed question of law and fact . . . [for determining] whether a defendant's factual copying constitutes actionable infringement." *See Blehm*, 702 F.3d at 1199. Specifically, the trier of fact must decide "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude" that the two compilations are virtually identical. *See id. at* 1202; *Apple Computer*, 35 F.3d at 1439; *cf. Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1288 (10th Cir. 1996) ("The essence of [the substantial similarity] test is whether the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook

them, and regard their aesthetic appeal as the same."). Adjudicating this test will typically turn on a factfinder's "good eyes and common sense in comparing the two works' total concept and overall feel." *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 684 (2014). A court may independently grant summary judgment for Craft Smith on this test alone if it finds "the protectable expression in the copyrighted work and the allegedly infringing work is so dissimilar . . . that no reasonable jury could find for the plaintiff" on the question of supersubstantial similarity. *See Savant Homes*, *Inc. v. Collins*, 809 F.3d 1133, 1140 (10th Cir. 2016); *Blehm*, 702 F.3d at 1202-03.

The court thus now considers whether the 2016-17 Recollections Planners "copied substantially the entire" applicable selection and arrangement of EC's corresponding 2015-16 LifePlanners. While this test is often left to a jury, the court agrees with Craft Smith that no genuine issue of fact exists as to whether an ordinary reasonable observer would conclude that the Recollections Planner is "virtually identi[cal]" to EC's LifePlanner compilation, which is a "thin" work when divorced of its specific 2-D artwork, phrases, and graphics. As in *Blehm* (where the less exacting substantial similarity test was employed to compare stick figure drawings), the court has examined the juxtaposing images of the two planners, and now rules that "no reasonable juror" could conclude that these corresponding compilations are supersubstantially similar. *See Blehm*, 702 F.3d at 1205. Though not a comprehensive list, below are some of the relevant differences between the two compilations that the court finds dispositive in its determination:

- **Covers:** The LifePlanner and Recollections Planner covers look completely different from each other. Both LifePlanners include the words "HORIZONTAL (or VERTICAL) WEEKLY LAYOUT" on the cover/title page, and include the distinctive words "THIS*IS*MY*LIFE" above two dotted lines which are presumably for the owner to write her name on. LifePlanners also include an initial transparent (with added colorful design) hardcover, allowing you to see

these words beneath it.  By contrast, Recollections do not include a transparent cover, but instead have a laminated cover with a colorful design and the year "2017" written on it, but no words.  (ECD_0005076, ECD_0005355, ECD_0005356, ECD_0030828, ECD_0029129.)

- **Front Flap:** Both Recollections Planners also include a descriptive front flap located on top of the front cover indicating the price of the item, the words "Recollections," "CREATIVE YEAR," "12 Month Spiral Planner", "Horizontal (or Vertical) Weekly Layout" and the planner's dimensions.  The court finds that it would be virtually impossible for someone to examine the Recollections Planner's front flap and *not* know it is a Recollections Planner.  Furthermore, the Recollections Planner cover design is specially tailored to coordinate with this front flap and for the flap to not cover up the artwork or "2017" year title.  The LifePlanners include no such descriptive flap on top of the front cover or similar coordination.  (ECD_0005076, ECD_0005355, ECD_0029129, ECD_0030827, ECD_0030828.)
- **Coils:** Although both LifePlanners and Recollections Planners have a shiny spiral metallic coil binding, the court finds the two coils to be noticeably different in appearance, quality of material, and how the coil feels both when the planners are held and when the pages are turned.
- **Tabs:** The LifePlanner tabs begin with a tab indicating that the planner's calendars span between "2015/2016", whereas the first Recollections tab indicates that the planner's calendars only include the year "2017".  Furthermore, the Horizontal LifePlanner's next tab commences with a "July" calendar, while the Horizontal Recollections planner's next tab commences with a "January" calendar.  (ECD_0029131, ECD_0005077.)
- **Introductory Page:** Both LifePlanners include an introductory short phrase corresponding to the first tab and immediately prior to the thumbnail calendars, while the Recollections Planners instead have the phrase "This Life Belongs To" corresponding to that tab (before its thumbnail calendars), above four lines for the owner to presumably write her name on.  (ECD_0029131, ECD_0030830, ECD_0005357, ECD_0005358, ECD_0005078.)
- **Thumbnail Calendars:** The LifePlanners' thumbnail calendars span from July 2015 to December of the following year, while Recollections' thumbnail calendars span a full two years (2017-18).  (ECD_0005359, ECD_0005360, ECD_0030831, ECD_0030832.)
- **Short Phrases:** The LifePlanner includes one section short phrase for every single month, whereas Craft Smith includes short phrases for only six months in the vertical version and only seven months in the horizontal version.
- **Important Contacts and Dates:** After the thumbnail calendars, LifePlanner has a section of short phrases with an accompanying twelve blank boxes corresponding to the colors of each month.  Recollections includes no such section of phrases or boxes, but instead has a list of "important contacts" where the owner can record name, address, phone, email, and birthday of each contact, as well as "important dates" and a corresponding twelve-month thumbnail calendar.  LifePlanners include no section for important contacts or important dates there. (ECD_0030833, ECD_0030834, ECD_0005082, ECD_0005083.)

- **Monthly Calendars:** Each of the LifePlanners' two-page spread calendars at the beginning of each month have "GOALS" written in the right lined margin, where the Recollections planners have "Notes" written instead there, with a separate colorful section in the bottom right corner (without lines) that is absent from the LifePlanners.  (Dkt. No. 112 at 42.)
- **Weekly Calendars:** For the vertical layout weekly calendars, the LifePlanner includes a "Thankful Thought" box in the top left corner, where the Recollections calendars have the month box in the corner with a "GOALS FOR THE WEEK" section located below it.  (Dkt. No. 112 at 43-44.)  For the horizontal layout weekly calendars, the LifePlanner has a graphics on the top, with "Notes" and "Thankful Thought" section in the bottom right area, where Recollections have no graphics on top, and instead a "Notes and Thoughts" and "Weekly Goals" section in the bottom right area.  (Dkt. No. 112 at 45.)
- **Stickers:** While some of the stickers are similar in appearance and layout, the contents of those stickers are very different.  For instance, the horizontal LifePlanner has a full page of "birthday" stickers followed by a page with other assorted stickers (ECD_0005331, ECD_0005333); in contrast, the horizontal Recollections Planner only has one such similar sticker page (with only one column of birthday stickers included), followed by multiple pages with stickers of vastly different sizes and shapes that look dramatically different from LifePlanner's mostly uniform stickers. (ECD_0029299, ECD_0029300.)
- **Cutaway Folder:** The LifePlanner's cutaway folder includes the words "keep it TOGETHER" on the cutaway pocket (on both sides) with a blank background, where Recollections' cutaway folder pocket has no words on it but only pattern that matches the design of the entire folder.  (ECD_0005542, ECD_0005543, ECD_0029303, ECD_0029304.)
- **Pouch:**  Both LifePlanners have a transparent plastic pouch containing numerous paper items.  The Recollections Planners have a transparent plastic pouch, but it doesn't include any items inside.  (EDC_0005544-0005561, ECD_0029305.)

Accordingly, the court holds that even if it were necessary to conduct a similarity test, Craft Smith did not copy "substantially the entire" LifePlanner compilation at issue here, nor could an "ordinary reasonable person" conclude that the two compilations are "virtually identical."  Because EC Design cannot prevail under the supersubstantial similarity test (in addition to the reasons discussed earlier), Craft Smith and Michaels are entitled to summary judgment of no copyright infringement.

## II.   Trade Dress Infringement Claim

A trade dress is an object's "total image and overall appearance," and "may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1146 (10th Cir. 2016). The Lanham Act's "protection of trademarks and trade dress serves the same statutory purpose of preventing deception and unfair competition. . . . [and securing] to the owner of the [trade dress] the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Id.* In enacting the Lanham Act, Congress determined that federal protection of trademarks and trade dress was desirable because they "foster competition and the maintenance of quality by securing to the producer the benefits of good reputation." *Id.* at 1147.

To obtain relief for trade dress infringement under § 43(a) of the Lanham Act, EC Design must show: "(1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional." *Savant Homes*, 809 F.3d at 1147.

EC Design claims that the features described and illustrated in its Second Amended Complaint (Dkt. No. 54 at 11-22) as well as "their combinations and the total image and overall look and feel [these] features impart upon the LifePlanner Products and in the minds of consumers, constitute a distinctive trade dress associated with the LifePlanner Products" (hereafter the "LifePlanner Trade Dress"). (Dkt. No. 54 at 22-23.)

Besides the difficulty of instructing a jury regarding the LifePlanner Trade Dress, the court finds that Craft Smith has met its burden of demonstrating that no genuine issue of material fact exists regarding the issues of distinctiveness and likelihood of customer confusion. EC's

interpretation of the Lanham Act would do more to inhibit than foster free and fair competition in the day planner industry.  Craft Smith and Michaels are thus entitled to summary judgment of no trade dress infringement.

### a.   Generic vs. Descriptive Trade Dress

Like trademarks, trade dress claims "are often classified in categories of generally increasing distinctiveness; following the classic formulation . . . they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful."  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).  The latter three categories have been regarded by courts to be inherently distinctive because their intrinsic nature effectively identifies particular product sources, and are thus entitled to protection under the Lanham Act.  *Id.*  While "descriptive marks may acquire the distinctiveness which will allow them to be protected" under the Lanham Act, a generic trade dress or mark is not entitled to protection because it can never be source-identifying.  *See Two Pesos*, 505 U.S. at 769.  Thus, "even a showing of secondary meaning could not make [a generic trade] dress distinctive."  *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995).

A trade dress is "generic" if it "is defined as a mere product theme or style of doing business or is such a . . . common design that it cannot identify any particular source."  1 McCarthy on Trademarks and Unfair Competition § 8:6.50 (5th ed.)  "[E]vidence of extensive third-party use supports a finding that [a product's] design is generic."  *See Can't Live Without It, LLC v. ETS Express, Inc.*, 287 F. Supp. 3d 400, 406 (S.D.N.Y. 2018).  Furthermore, "[t]he fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea."  *Jeffrey Milstein*, 58 F.3d at 32.

Craft Smith in its reply brief argues that EC's claimed LifePlanner product design trade dress is "clearly generic and incapable of having secondary meaning." (Dkt. No. 145 at 21-22.) In support of this, Craft Smith submits evidence of six other competing planner providers who used most or all of the same set of allegedly source identifying planner components (*Id.* at 28-45.) Additionally, Craft Smith contends that as a result of this genericness "there is nothing at this point to suggest the Court could even instruct the jury on what the trade dress claim is." (*Id.* at 29, 43.)

EC responds that in the Tenth Circuit, trade dress rights may exist in the "overall image and appearance, and may include features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002). EC further argues that, unlike in *Jeffrey Milstein*, the LifePlanner's asserted trade dress would not inhibit competition in the planner industry because it "does nothing to impair Defendants' ability to market and sell planners with laminated front covers, introductory sections, tabs, monthly calendar sections, weekly calendars in vertical and horizontal layout, notes sections, and sticker pages separately or as part of their own arrangement, color schemes, and design elements—so long as the overall look and feel is not confusingly similar to the LifePlanner." (Dkt. No. 171 at 8-9.) EC also observes that of the third-party planners that Craft Smith relies on in its reply brief, only three of them were on the market when Craft Smith copied parts of the LifePlanner in 2016. (*Id.* at n.45.)

"[T]here is no question that trade dress may protect the 'overall look' of a product. Thus, [a]lthough each element of a trade dress individually might not be inherently distinctive, . . . the combination of elements may be indicative of source." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997). For instance, the Supreme Court in *Two Pesos*

*v. Taco Cabana* described a protectable restaurant trade dress as a composition of elements that individually appear to be quite generic:

> [A] festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes.

505 U.S. at 765. Rather than limiting the LifePlanner's dress to its oversimplified features such as a laminated front cover, colorful tabs, sticker pages, etc. as Craft Smith attempts to do, the court is persuaded as an initial matter that EC has sufficiently demonstrated that the LifePlanner Trade Dress is not generic. The court finds the "overall look and feel" of its combination of specific features comprising its overall appearance is sufficiently detailed to satisfy the minimum threshold of descriptiveness. (*See* Dkt. No. 171 at 5-7.) Craft Smith has failed to establish as a matter of law that the overall look and feel of the LifePlanner Trade Dress is so common in the industry to render it generic.

### b. Inherent Distinctiveness

While the LifePlanner Trade Dress is not generic, to prevail in its claim against Craft Smith EC Design must ultimately prove that the LifePlanner Trade Dress is also distinctive.

A trade dress is inherently distinctive if "its intrinsic nature serves to identify a particular source." *Sally Beauty*, 304 F.3d at 977. Secondary meaning is the only avenue available for proving distinctiveness if the claimed dress is a product design (in contrast with product packaging), because "a product's design [can]not be inherently distinctive." *Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1247 (10th Cir. 2016). Because EC's claim is a product *design* trade dress claim, rather than a product packaging claim, it is unable to show inherent distinctiveness in the LifePlanner Trade Dress, and must instead prove acquired distinctiveness

through secondary meaning.  *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 215 (2000) ("[T]o the extent there are close cases, … courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning.").

### c.  Acquired Distinctiveness – Secondary Meaning

"A trade dress which is not inherently distinctive . . . may acquire distinctiveness through secondary meaning." *Sally Beauty*, 304 F.3d at 977.  "Trade dress is said to have developed secondary meaning 'when in the minds of the public, the *primary* significance of the mark is to identify the source of the product rather than the product itself.'" *Forney Indus.*, 835 F.3d at 1253 (emphasis added) (quoting *Wal-Mart Stores*, 529 U.S. at 211).  Evidence of secondary meaning may be either direct or circumstantial.  *Savant Homes*, 809 F.3d at 1148.  The issue of whether a trade dress has acquired secondary meaning "is a question of fact and thus generally should not be decided at the summary judgment stage." *Sally Beauty*, 304 F.3d at 978.

However, because this is a product design case the court must also weigh the difficult burden of proof EC must ultimately meet to prevail with a jury, as "[i]t is particularly difficult to prove that a product design has acquired secondary meaning."  McCarthy on Trademarks § 8:11.50 (5th ed.)  Regarding this difficulty in product design cases, the District of Utah has observed that courts should "exercise[] particular 'caution' when extending protection to product designs" as opposed to its packaging, because the "potential for misuse of trade dress law is of particular concern in product design cases, as 'product design almost invariably serves purposes other than source identification.'" *Hammerton, Inc. v. Heisterman*, No. 2:06-CV-00806 TS, 2008 WL 2004327, at *6 (D. Utah May 9, 2008) (quoting *Wal–Mart Stores*, 529 U.S. at 213).

### i. Direct Evidence of Secondary Meaning

Direct evidence of secondary meaning generally consists of survey evidence or consumer testimony. *Savant Homes*, 809 F.3d at 1148. The court agrees with Craft Smith's argument that EC has none. EC must thus therefore ultimately prove secondary meaning through circumstantial evidence. *See Wal–Mart Stores*, 529 U.S. at 211.

### ii. Circumstantial Evidence of Secondary Meaning

In the Tenth Circuit, courts must weigh the following factors to determine circumstantial evidence of secondary meaning:

> (1) the length and manner of the trade dress's use; (2) the nature and extent of advertising and promotion of the trade dress; (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the trade dress and a particular product or venture; (4) actual consumer confusion; (5) proof of intentional copying; or (6) evidence of sales volume.

*Savant Homes*, 809 F.3d at 1148.

After evaluating each of these factors below, the court holds that no reasonable jury could find that "in the minds of the public, the primary significance" of the LifePlanner Trade Dress "is to identify the source of the product," namely EC Design. Although EC "has introduced some of the circumstantial evidence often used to support such a finding," the lack of direct evidence that consumers associated the LifePlanner Trade Dress solely with EC Design, as well as "the lack of evidence as to confusion on the part of actual consumers [regarding the source of the Recollections Planner], renders this circumstantial evidence insufficient for a reasonable juror to find that the trade dress had acquired a secondary meaning." *See Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 45 (1st Cir. 2001). EC Design has thus "not made the vigorous evidentiary showing required by this Court," entitling Craft Smith to summary judgment. *See id.*

### 1. *Length/manner of the trade dress's use*

To acquire secondary meaning, a trade dress "must have been used so long and so exclusively by one producer with reference to his goods or articles that, in the trade and to that branch of the purchasing public, the [trade dress] has come to mean that the article is his product." *Savant Homes*, 809 F.3d at 1148. This important factor weighs heavily in the case law for establishing proof of secondary meaning, so the court now gives it due consideration.

EC argues that although all elements of the LifePlanner Trade Dress have only been used entirely in combination since the summer of 2015, the core elements of the trade dress have been presented much longer than that. (Dkt. No. 126 at 38.) For instance, since EC's original LifePlanner was released in 2007, the LifePlanner has always featured "a bright and colorful vertical weekly layout, a customizable cover, a coiled binding, and stickers." (*Id.*) Since 2008, the front and back covers have been laminated. And since 2011, EC's planners have included colorful monthly tabs. (*Id.*) Further, the interior contents have never been customizable. (*See id.* at 17.)

Craft Smith responds that each of these elements can be found in combination on various other competitors' planners as of October 2016, particularly the LimeLife and Plum Paper planners which use the same general size, single coil binding system, a laminated cover with artwork, and colored tabs. (Dkt. No. 98 at 11-12.) As Craft Smith persuasively argues, "it simply strains credulity to contend that these features would be solely associated with EC, or with any other single source . . . when so many others were using substantially the same combination of arguably visible features on or before October 2016." (*Id.* at 37.) Additionally, the LifePlanner's cover designs have varied significantly over the years, and have been customizable from year to year. The LifePlanner has included prominent new artwork, designs

and features each year, with some covers even omitting the familiar "erinCondren" trademark or asterisk symbol on them.

The court finds the LifePlanner's wide variation of its prominent features over time to be particularly significant in determining that the LifePlanner Trade Dress's "manner of use" has been inconsistent with a primarily source identifying function. Additionally, the fact that the LifePlanner Trade Dress had only been used entirely in combination for slightly more than one year before the Recollections Planner's October 2016 release directly undermines EC's notion that the LifePlanner Trade Dress was used "so long and so exclusively" as to make source identification (i.e., identifying Erin Condren) its primary significance in the mind of the public. Furthermore, the presence of these features in various other competitors' planners shows that EC's alleged "exclusivity" of trade dress is highly suspect at best. The court thus finds that this "length/manner of use" factor cuts strongly in favor of Craft Smith.

### 2. *Nature/extent of advertising and promotion of the trade dress*

"To demonstrate secondary meaning based on advertising, the advertising must be of a nature and extent to create an association [of the trade dress] with the advertiser's goods." *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009). "[A]dvertising alone is typically unhelpful to prove secondary meaning when it is not directed at highlighting the trade dress." *Forney Indus.,* 835 F.3d at 1254. Furthermore, "[a]dvertising that touts a product feature for its desirable qualities and not primarily as a way to distinguish the producer's brand is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir. 1995).

EC Design points to its online advertising efforts which included recognizable elements of the LifePlanner Trade Dress (including advertising its "playful artistic design" and the

vertical/horizontal layouts), allegedly spending more than $600,000 in total advertising, and with its webpages receiving over 42,222,000 user sessions since 2013. (Dkt. No. 126 at 49; Dkt. No. 98 at 39.)

However, the court agrees with Craft Smith that EC has failed to produce satisfactory evidence that the advertising of the LifePlanner Trade Dress was used "primarily" to distinguish EC's brand rather than to tout its desirable qualities. (Dkt. No. 98 at 39.) EC's advertising appears to have been directed more at its desirable qualities than toward creating an association between the particular features of the LifePlanner Trade Dress and Erin Condren as the product's source. The court finds "the lack of evidence as to advertising of the *specific* trade dress claimed . . ." to be dispositive for purposes of this factor. *See Yankee Candle*, 259 F.3d at 44. Accordingly, EC's evidence of advertising is unable to establish secondary meaning—this factor also favors Craft Smith.

### 3. *Promotion of public's conscious connection between trade dress and EC Design*

The court relies in part on the reasoning in *Yankee Candle* for approaching the issue of secondary meaning. In that case, the U.S. Court of Appeals for the First Circuit upheld the district court's grant of summary judgment of no infringement. The district court's determination that Yankee had failed to show secondary meaning was largely focused on "the lack of evidence . . . demonstrating a conscious connection by the public between the claimed trade dress and the product's source." *See Yankee Candle*, 259 F.3d at 44.

The same is true for EC Design. As with the first two factors (which overlap significantly with this factor), this factor cuts in Craft Smith's favor. In addition to the reasoning discussed above, because the LifePlanner Trade Dress description is difficult to describe in the first place, the court finds that EC's lack of consistency in the manner and use of the LifePlanner

Trade Dress over the years suggests no significant effort by EC to connect the already elusive and abstract LifePlanner Trade Dress with Erin Condrin as the product source.  Rather, the evidence suggests that EC was content to focus on promoting its distinctive trademarks ("LifePlanner," "Erin Condren," and iconic asterisk/negative asterisk symbols) to create the conscious connection between those marks and EC Design as the source (*see* Dkt. No. 98 at 29-37), rather than the LifePlanner Trade Dress as asserted in this action.

### 4. *Actual consumer confusion*

In its interrogatory response, EC admits that it is "unaware of any reported instances of actual [customer] confusion" between the LifePlanner and Recollections Planner, and did not deny Craft Smith's statement of undisputed material fact that EC has no evidence of actual customer confusion.  (*See* Dkt. No. 96-2 at 143; Dkt. No. 145 at 12.)  Nevertheless, EC still "alleges there is a likelihood of customer confusion."  (Dkt. No. 96-2 at 143.)

The court disagrees with EC's argument on likelihood of customer confusion.  There are numerous significant differences between the LifePlanner and the Recollections Planner, beginning perhaps most importantly with the planners' covers themselves (artwork, presentation, etc.) and the descriptive flap covering part of the front of the Recollections Planner.  Based on these "first impression" distinctions alone, it is highly unlikely that an ordinary consumer of these products would find these two products confusingly similar.  In addition to these differences in outward appearance, there are numerous other weighty differences discussed above in the copyright section of this opinion. Unlike with EC's copyright claim, here the differences in 2-D artwork, introductory and section phrases, graphics, and even use and placement of the trademarks themselves ("Recollections," "Erin Condren," "LifePlanner,"

asterisks, etc.) are all material to the analysis of whether ordinary consumers were likely confused by the Recollections Planners' "look and feel."

EC's lack of evidence otherwise is also instructive for this factor. With all of these significant, material differences between the two products, the court holds that no reasonable jury could conclude that an ordinary consumer would have been confused as to the source of the Recollections Planner when purchasing it.

### 5. *Proof of intentional copying*

"Proof of copying may be sufficient in and of itself to establish secondary meaning because there is no reason to copy a non-functional feature except to capitalize on an already existing secondary meaning." *Hartford House Ltd. v. Hallmark Cards Inc.*, 647 F. Supp. 1533, 1542 (D. Colo. 1986), *aff'd*, 846 F.2d 1268 (10th Cir. 1988). "When a defendant intentionally uses the trademark of another it is presumed he did so in order to cause confusion between his products and those of the one holding the trademark." *Marker Int'l v. deBruler*, 635 F. Supp. 986, 1000 (D. Utah 1986), *aff'd*, 844 F.2d 763 (10th Cir. 1988).

However, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001). Indeed, "copying is not always discouraged or disfavored by the laws which preserve our competitive economy." *Id.*

Furthermore, "[c]opying is only evidence of secondary meaning if the defendant's *intent* in copying is to confuse consumers and pass off his product as the plaintiff's." *Thomas & Betts*, 65 F.3d at 663 (emphasis added). In other words, a copier "may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source." *Duraco Prod., Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1453 (3d Cir. 1994). "If

copying alone were sufficient to establish secondary meaning, then all product features that might attract copying by competitors would achieve secondary meaning upon the first instance of such copying." *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 669 F. Supp. 2d 1235, 1249 (D. Colo. 2009). "That would gut 'secondary meaning' of any substance, replacing it with a rule that the first person to market a feature may prevent others from incorporating the feature into their products." *Id.*

EC has submitted evidence demonstrating that Craft Smith intentionally attempted to copy much of the LifePlanner's layout and many of its features. Craft Smith has not contested much of this evidence. However, Craft Smith persuasively argues that this case is different than cases like *Marker*, where the defendant had stated

> that he continued to use [the disputed mark] because [plaintiff] had a reputation for quality products and he believed people might associate that reputation with defendant's products. . . . The *Marker* court deemed this an admission by defendant that plaintiff's mark had achieved secondary meaning. The reason for copying was critical to the court's decision. The copying alone did not constitute an admission of secondary meaning.

*Predator Int'l*, 669 F. Supp. 2d at 1248; *see also Yankee Candle*, 259 F.3d at 45 ("[T]he relevant intent is not just the intent to copy, but to 'pass off' one's goods as those of another."). By contrast, Craft Smith asserts that in this case no evidence has been presented of its intent to pass off the Recollections Planner as a LifePlanner, thereby capitalizing on EC's reputation.

EC has failed to present evidence of Craft Smith's intent to cause customer confusion as to the source of the trade dress. Rather, the court is persuaded that Craft Smith's intent was more likely to exploit some of the LifePlanner's desirable features, while intentionally avoiding any copying of EC's artwork, graphics, and text. While EC has proven Craft Smith's obvious intentional copying, EC would ultimately not be able to support a finding of secondary meaning

on this fact alone.  At best this factor is inconclusive.  The court finds that EC's intentional copying evidence alone is insufficient to defeat summary judgment.

### 6. *Sales volume evidence*

"Sales volume . . . only suggests secondary meaning when presented in conjunction with other evidence; standing alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification." *Savant Homes*, 809 F.3d at 1148.

Between 2009 and 2017, EC Design sold 1,549,770 LifePlanners, earning $65 million in revenue from those sales. EC argues that its high volume of sales alone provides important evidence that a large number of consumers were exposed to its trade dress, and thus that their consumers attribute the trade dress to the product's source.

Craft Smith retorts that sales evidence must be combined with additional evidence suggesting that the public actually perceives the LifePlanner's product design *primarily* as a source identifier, rather than just as its configuration and design. (Dkt. No. 145 at 15.)  In support of this contention, it cites the conclusion in *Duraco Products* that "[s]ales success by itself will typically not be as probative of secondary meaning in a product configuration case as in a trademark case, since the product's market success may well be attributable to the *desirability* of the product configuration rather than the *source-designating* capacity of the supposedly distinguishing feature or combination of features." *Duraco Prod.*, 40 F.3d at 1452 (emphasis added).

The court is persuaded that EC has not brought forth sufficient evidence to show that the LifePlanner's success is attributable primarily to its source-designating capacity.

#### d. Conclusion

Accordingly, because EC Design failed to raise a genuine issue of material fact regarding inherent distinctiveness or secondary meaning, "it failed to satisfy its summary judgment burden on its trade dress claim." *Savant Homes*, 809 F.3d at 1150. Craft Smith has therefore met its burden, and is entitled to judgment as a matter of law of no trade dress infringement.

### III.    Unfair Competition and Misappropriation Claims

Because all federal claims have been eliminated, and this is not a diversity case, the court elects not to exercise supplemental jurisdiction over EC's remaining state law claims pursuant to 28 U.S.C. § 1367(a). Accordingly, the remaining state law claims are dismissed without prejudice.

### <u>ORDER</u>

For the foregoing reasons, IT IS HEREBY ORDERED that Craft Smith and Michaels' Motion for Summary Judgment of no copyright or trade dress infringement (Dkt. No. 96) is GRANTED. EC Design's Motion for Partial Summary Judgment (Dkt. No. 110), Craft Smith and Michaels' Motion to Exclude Expert Opinions of Richard S. Hoffman (Dkt. No. 99), and EC Design's Motion to Exclude Expert Opinions of Clarke Nelson (Dkt. No. 107) are consequently MOOT. EC Design's Counterclaim is hereby DISMISSED with prejudice.

Signed May 17, 2019.

BY THE COURT

_____
U.S. District Judge Dee Benson